## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**McGIVNEY & KLUGER, P.C.**
Mary F. Higgins (No. 4179)
1001 North Jefferson Street, Suite 208
Wilmington, DE  19801
(302) 225-0458 – Telephone
(302) 777-4111– Facsimile
Attorneys for Defendant

| | |
|---|---|
| RAYMOND W. COBB and RAYMOND W. COBB, LLC, A Delaware Limited Liability Company, <br><br>         Plaintiffs, <br><br>         vs. <br><br> McGIVNEY & KLUGER, P.C.,  A Foreign Professional Corporation <br><br>         Defendant. | **ANSWER, COUNTERCLAIM, DEMAND FOR JURY TRIAL AND SEPARATE DEFENSES** <br><br> **Civil Action No. 08-cv-00123 (TBA)** |

Defendant McGivney & Kluger, P.C. ("MK"), by and through the undersigned attorneys, states by way of Answer to the Complaint of the plaintiffs and says:

## ANSWER

1.      MK admits the allegations Paragraph 1 of the Complaint.

2.      MK admits the allegations Paragraph 2 of the Complaint.

3.      MK admits the allegations of the first sentence of Paragraph 3 of the Complaint, except that it denies the allegation that it "failed to qualify" to do business in Delaware as a foreign corporation.  The second sentence of that Paragraph states a legal conclusion to which no response is required.  To the extent that plaintiffs allege the provisions of Delaware law concerning service of

process, MK has acknowledged receipt of the Complaint and will execute an acknowledgment of service regarding the same.

4.     MK denies the allegations Paragraph 4 of the Complaint that plaintiff Raymond W. Cobb was an employee of MK.   MK admits that Cobb refused to become an employee of MK, and that it initially entered into a contract with Cobb whereby he would be paid $125 per hour conditioned upon, *inter alia,* his submitting draft bills in a timely fashion and in accordance with MK's billing guidelines so that his time could be billed to the insurers who had referred their insureds to MK.  MK further admits that Cobb, in light of his delays in submitting draft bills, acknowledged that he would get paid when MK got paid.  MK denies the remaining allegations of this Paragraph.

5.     MK admits the allegations of the first sentence of Paragraph 5 of the Complaint that Raymond W. Cobb performed work for MK's clients.   While MK admits the allegations of the second sentence of this Paragraph, that he submitted bills to MK for time spent on working on its matters and that he has demanded compensation, MK denies that the bills he submitted were submitted in accordance with his contract with MK.  MK denies the remaining allegations of this Paragraph.

**<u>COUNT ONE</u>**

6.     MK repeats and realleges all previous responses to the allegations of the Complaint as set forth herein at length.

7.     MK denies the allegations Paragraph 7 of the Complaint that plaintiff Raymond W. Cobb was an employee of MK.   MK admits that Cobb refused to become an employee of MK, and that it entered into a contract with Cobb whereby he would be paid $125 per hour conditioned upon, *inter alia,* his submitting draft bills in a timely fashion and in accordance with MK's billing

2

guidelines so that his time could be billed to the insurers who had referred their insureds to MK. MK admits that Cobb has submitted invoices seeking payment of $160, 563.52.   MK denies the remaining allegations of this Paragraph, including the allegation that the invoices submitted should be paid.

8.     MK admits the allegations Paragraph 8 of the Complaint that plaintiffs have made demands for payment of invoices they have submitted.  MK admits that it has reasonable grounds to dispute that the invoices plaintiffs claim to be due and payable are in fact due and payable as submitted.  MK denies the remaining allegations of this Paragraph, including the allegations that any payments due to Cobb from MK are "wages."

9.     Paragraph 9 of the Complaint states a legal conclusion to which no response is required.  MK admits that the allegations of liability pursuant to the cited statute are frivolous because, *inter alia*: a) Cobb is estopped from claiming that he was an employee of MK, a status he refused; b) Cobb was not an "employee" pursuant to applicable law.

## COUNT TWO

10.     MK repeats and realleges all previous responses to the allegations of the Complaint as set forth herein at length.

11.     MK denies the allegations of the first sentence of Paragraph 11 of the Complaint that plaintiff Raymond W. Cobb was an employee of MK. MK admits that Cobb refused to become an employee of MK, and that it entered into a contract with Cobb whereby he would be paid $125 per hour conditioned upon, *inter alia,* his submitting draft bills in a timely fashion and in accordance with MK's billing guidelines so that his time could be billed to the insurers who had referred their insureds to MK.  MK admits that Cobb did perform certain legal services for its clients, but denies the remaining allegations of this Paragraph and specifically denies that all time invoiced by plaintiffs

3

was for legal services performed consistent with MK's and/or the insurers' billing guidelines and practices.

12.    MK denies the allegations of Paragraph 12 of the Complaint.

13.    MK denies the allegations of Paragraph 13 of the Complaint, but admits that it has suffered consequential damages as a result of plaintiffs' breach of contract.

**WHEREFORE**, defendant McGivney & Kluger, P.C., demands judgment dismissing the Complaint, with prejudice, as well as attorney's fees, costs of suit and all other applicable relief available under applicable law which this Court deems just.

## <u>AFFIRMATIVE DEFENSES</u>

1.    Plaintiffs have made clear and definite promises upon which MK has relied to its detriment, and to that extent, the Complaint is barred by promissory estoppel.

2.    The demands of equity and conscience are such that plaintiffs' cannot deny their previous words and conduct, and plaintiffs' Complaint is barred by equitable estoppel.

3.    Plaintiffs' inequitable conduct entitles defendant to rescission and/or reformation of the contract identified in the Complaint.

4.    Plaintiffs have affirmatively waived their right to the relief they seek.

5.    Plaintiffs' Complaint is barred by the applicable statute of limitations.

6.    Plaintiffs' Complaint is barred by the doctrine of unclean hands.

7.    Plaintiffs' Complaint is barred by any setoff and/or recoupment to which MK is entitled.

8.    Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

9.    Plaintiffs' Complaint is barred by to the extent that they failed to take reasonable steps to mitigate their damages.

10.     Plaintiffs' Complaint is barred to the extent any damages plaintiffs claim were the result of their sole and/or contributory negligence.

11.     Plaintiffs' Complaint is barred to the extent there has been an accord and satisfaction between the parties.

12.     Plaintiffs' Complaint is barred to the extent they have failed to fulfill a condition precedent to defendant's obligations to them.

13.     Plaintiffs' Complaint is barred due to a failure of consideration.

14.     Plaintiffs' Complaint is barred to the extent defendant's Counterclaims set forth below.

15.     Plaintiffs' Complaint is barred to the extent there was a mutual mistake of fact.

16.     Plaintiffs' Complaint is barred to the extent there was a unilateral mistake of fact of MK and inequitable and/or unconscionable conduct on the part of plaintiffs.

17.     By their words and conduct, the parties have abandoned and/or modified their original contract and plaintiffs are not entitled to recovery thereby.

18.     To the extent plaintiffs contend that the contract permits them to be compensated for work that was performed an unreasonable length of time prior to the submission of plaintiffs' draft bill/invoice, such would be unconscionable.

**WHEREFORE**, defendant McGivney & Kluger, P.C., demands judgment dismissing the Complaint, with prejudice, as well as attorney's fees, costs of suit and all other applicable relief available under applicable law which this Court deems just.

## <u>COUNTERCLAIM</u>

In accordance with Federal Rule of Civil Procedure 13(a), MK states by way of Counterclaim against the plaintiffs as follows:

## I.  JURISDCITION

19.    MK repeats and realleges all previous responses to the allegations of the Complaint as set forth herein at length.

20.    In their Complaint, plaintiffs allege that they are owed $165,025 as a result of MK's breach of contract by reason of its failure to have paid them pursuant to the contract.

21.    Plaintiffs also allege that MK is liable for double damages and attorney's fees for violation of 19 Del. C. 1101, *et seq.*

22.    MK believes that the demand for enhanced damages under Delaware law is frivolous.

23.    Nonetheless, the foregoing allegations and statements on behalf of the plaintiffs demonstrate that the amount in controversy herein exceeds $75,000.

24.    At all times relevant, MK has maintained its principle office at 23 Vreeland Road, Suite 220, Florham Park, New Jersey.

25.    At all times relevant, MK also maintained an office 1001 North Jefferson Street, Suite 208, Wilmington, Delaware.

26.    Based on the foregoing and the admitted allegations of the Complaint above, there is complete diversity of citizenship between the parties.

27.    In light of the amount in controversy and the diversity of citizenship of the parties, there was original jurisdiction in this Court as of the filing of the Complaint per 28 U.S.C. §1332(a) (1) and (c) (1), and, accordingly, the within Counterclaim.

28.    Therefore, by reason of the diversity of citizenship between the parties and the amount in controversy, this action could have been initiated in this Court and was properly removed pursuant to 28 §U.S.C. 1441(a and b).

## II. VENUE

29.    Pursuant to 28 U.S.C. §1441(a), venue is proper in the United States District Court for the District of Delaware because this District embraces the place where the removed action was pending.

## III. FACTS COMMON TO ALL COUNTS

30.    MK's origin dates to 1994, when Charles M. McGivney, Esq. and Jeffrey S. Kluger, Esq. formed the firm in Florham Park, New Jersey.

31.    Since its inception, MK has concentrated its practice in insurance defense litigation, primarily in mass tort, complex products liability, general liability and construction litigation.

32.    Since the founding of the firm, MK and its affiliates have grown almost exponentially, and now employ over 50 attorneys with offices in Florham Park and Sparta, New Jersey; Syracuse and New York, New York; Philadelphia, Pennsylvania; Harford, Connecticut, Wilmington, Delaware; Providence, Rhode Island, and Boston, Massachusetts.

33.    Each office of MK services a similar 'book of business,' with the overwhelming majority of the firm's work deriving from its insurance defense practice.

34.    MK is seeking qualification to do business in Delaware as a foreign corporation per 8 Del. C. §371 and may, therefore, maintain and defend the within action per 8 Del. C. §383(a and b).

35.    The billing for MK and its affiliates is largely centralized through the Florham Park office, including MK's administrative personnel and shareholders (referred to herein as "partners").

36.    Most of the firm's billing practices are dictated by either written guidelines of its

insurance company "clients," (the "insurers") or custom and practice which they outline.

37.     These billing practices, written or otherwise, regulate the frequency of billing (*i.e.,* monthly v. quarterly), the format and style of the bills, and certain uniform practices regarding content.

38.     For example, the insurers' guidelines and practices often dictate that once a bill is submitted, time for the period billed, which was for some reason not included on the bill already submitted, cannot be later submitted for the insurer.

39.     For example, if an MK attorney doing work on the hypothetical matter of "Smith v. Jones" from January 1, 2007 through March 31, 2007, has not submitted her "time" to MK for entry into its billing system until after July 1, 2007, and a bill for the first quarter of 2007 had been submitted to Jones' insurer on April 10, 2007, MK would not be able to bill the insurer and receive payment for that attorney's time on Smith v. Jones for the first quarter of 2007.

40.     Thus, failure to adhere to the insurers' billing procedures can result in loss of revenue, turning otherwise collectable bills into write-offs.

41.     Compliance with the guidelines is at premium for MK because of its concentration in insurance defense work.

42.     Throughout the growth of the firm and its affiliates, MK has maintained strict adherence to the written and other guidelines of the insurers.

43.     MK has adopted its own internal billing guidelines (the "billing guidelines") so that those "billers" within the firm make their time entries in a manner that will conform to the insurers' guidelines and practices.

44.     In or about November 2006, MK interviewed Cobb for a position with MK as the supervising attorney for its Delaware practice.

45.    Cobb represented to MK that he had substantial experience in insurance defense matters and was familiar with insurance company billing practices that were reflected in MK's billing guidelines.

46.    Based on Cobb's representations of his background,  MK's website would later describe Cobb as follows:

> Mr. Cobb has over twenty years of experience in the fields of insurance defense litigation, product liability, toxic torts and asbestos litigation. He received his undergraduate degree from the University of Delaware in 1979 and his Juris Doctorate Degree from Villanova University in 1982. He is admitted to practice in Delaware State Court and in the United States District Court in the District of Delaware, as well as in the State Courts of Pennsylvania and New Jersey and the Federal District Courts of those states. He is also admitted to practice before the United States Court of Appeals for the Third Circuit and the United States Supreme Court.

> Mr. Cobb is a member of the Delaware Bar Association and the Defense Research Institute.

> Mr. Cobb has extensive trial experience in the Delaware and Pennsylvania asbestos litigation as well as in cases involving a variety of toxic torts. Mr. Cobb has extensive experience arguing before the Appellate Courts including the Federal Appeals Courts and the Delaware Supreme Court.

47.    MK initially offered Cobb the opportunity to become an employee of MK.

48.    Cobb took approximately two months in late 2006 to consider MK's offer, stating that he had to determine whether there would be any "conflicts" that would limit his ability to work with/for MK.

49.    Cobb ultimately refused to become an employee of MK.

50.    MK eventually entered into a contract with Cobb for him to become "of counsel" to MK and manage its Delaware practice, which would operate out of Cobb's office at 1001 North Jefferson Street Suite 208 Wilmington, Delaware.

51.     MK's contract with Cobb provided that he would receive $125 per hour for each hour of his work for which he submitted bills to MK at its Florham Park, New Jersey office, provided that they were submitted in form and content, and in a timely fashion, so that MK could be paid by the insurers for his time.

52.     From and after the inception of Cobb's contract with MK, he continued his own law practice.

53.     MK's contract with Cobb also required that he submit draft bills, or "pre-bills" to MK that were in substantial conformity with the form and content requirements set forth in its billing guidelines, and in a timely fashion so that MK could submit them periodically as may be permitted by the insurers (*i.e.*, monthly or quarterly).

54.     Cobb's obligation under his contract with MK to comply substantially with the billing guidelines was a material term of the contract, because while MK was willing to pay him once he submitted timely and appropriate draft bills, it was stated explicitly to him that without such compliance, MK would not be paid for work not billed in accordance with the insurers' guidelines.

55.     In other words, it was understood by all parties that, assuming Cobb complied with the contract and submitted his draft bills in a timely and guideline-compliant fashion, MK would take the risk of paying Cobb 'up-front' upon submission of such draft bills, because it was confident that it could receive payment from the insurers accordingly.

56.     If Cobb provided guideline-compliant draft bills in a timely fashion, then MK would be able to manually revise, for timely submission to the insurers, the scores of time entries on each bill from the Delaware office on cases Cobb was supervising and for which he had primary billing responsibility. In this way, MK would have the best opportunity to recoup its payments to Cobb.

57.     Cobb was never an employee of MK.

10

58.    The contract between MK and Cobb did not provide for the payment of "wages" as that term is defined under applicable wage and hour laws.

59.    Also, pursuant to Cobb's contract with MK, Cobb was to receive a "gross check" with the agreed compensation for hours billed in accordance with his obligations under the contract. That is, any payments to Cobb would not be reduced by withholding taxes.

60.    Cobb was not eligible for, and did not participate in, any of MK's fringe benefit programs, such as health insurance or 401K, and there were to be no deductions from any payments to him for such programs.

61.    While Cobb agreed at the inception of the contract to be "of counsel" to MK, he refused to hang a sign at his office stating that it was also MK's office or that he was "of counsel" to MK.

62.    As the first billing periods for Cobb's work came and went, it appeared that Cobb was not submitting draft bills to MK in a timely fashion, or in substantial compliance with billing guidelines as to form and content.

63.    MK partners and administrative personnel from its New Jersey offices spoke with Cobb on numerous occasions during 2007, both via telephone and in person. Those conversations were often confirmed in email from MK partners and administrative personnel to Cobb.

64.    The purpose of those communications was to impress upon Cobb that were he to continue to remain non-compliant in the timeliness, form and content of his draft bills, MK would not pay him because it would be difficult, if not impossible, for MK to subsequently recoup payment for that time from the insurers.

65.    Cobb repeatedly assured MK partners and administrative personnel that he was "working on it"; that is, that he would prepare and submit his bills as he was being encouraged to do

so for his own, and MK's, mutual benefit.

66.     Ultimately, and despite these numerous requests for the submission of draft bills in a timely fashion and in compliance with the billing guidelines, and Cobb's assurances that he would comply, Cobb did not comply.

67.     As a result of these delays and temporizing by Cobb, MK's partners and administrative personnel repeatedly told Cobb that he should increase his rate of bill submission because 'when we get paid, you'll get paid.'

68.     Cobb not only never disagreed with the characterization of MK's obligations to him set forth in the preceding paragraph, he acknowledged orally that he understood that was an appropriate method for MK to fulfill its obligations under their contract.

69.     In and after July 2007, MK added its own staff who used otherwise vacant space in Cobb's office.  MK agreed to pay (and has paid) Cobb $1,000 per month as of July 1, 2007, as "rent" for the use of his office space.

70.     Initially, MK hired a secretary.   In early August 2007, MK hired an associate attorney who was an employee of MK and who worked in its Delaware office.

71.     The attorney MK hired was able to enter "time" directly into MK's billing system.

72.     Nonetheless, in December 2007, Cobb terminated his secretary and instructed MK's secretary to answer his telephone.

73.     Cobb submitted his draft bills in the form of invoices to MK's Florham Park, New Jersey office, and submitted a total of 81 invoices to MK.

74.     Only three of Cobb's invoices to MK were dated prior to August 1, 2007.

75.     Five of Cobb's invoices to MK were dated between August 1 and August 17, 2007.

76.     73 of Cobb's invoices to MK were submitted on and after October 10, 2007.

77.     The invoices Cobb submitted were often either untimely as set forth above, or submitted in a fashion that required substantial revision by MK administrative personnel and partners in its New Jersey offices, before they could be sent to insurers for payment.

78.     MK did receive compensation for some of the hours for which Cobb submitted draft bills that it was able to submit to the insurers.

79.     Where Cobb has submitted his bills in appropriate format and in a timely manner, he will be compensated at the agreed upon hourly rate, after accounting for any damages suffered by MK.

80.     Cobb's failure to provide draft bills to MK in a timely manner, and in proper form, meant that MK could not submit those bills to the respective insurers.

81.     Thus, MK has or will lose the difference between its hourly rate for "partner time" and the $125 per hour it would pay to Cobb (assuming his bills were submitted timely and in proper format) for hundreds of hours of attorney time.

82.     Following his termination, Cobb has demanded that MK compensate him for his time despite his breach of his contract with MK in failing to have submitted draft bills for that time in accordance with the billing guidelines.

83.     MK has refused to pay Cobb for his time reflected in bills which, if submitted at all, were submitted too late and not in proper format, so that it could not obtain payment from the insurers.

84.     Cobb has demanded that MK vacate his premises on or before March 31, 2008.

85.     Cobb has further demanded MK make payment to him pursuant to 19 Del. C. § 1100, *et seq.*, or he would, as he has now done, institute an action to collect damages, liquidated damages, and/or penalties pursuant to that section.

86.    Cobb has demanded payment pursuant to 19 Del C. § 1103(b) which provides, in pertinent part, that:

> If an employer, without any reasonable grounds for dispute, fails to pay an employee wages, as required under this chapter, the employer shall, in addition, be liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day, except Sunday and legal holidays, upon which such failure continues after the day upon which payment is required or in an amount equal to the unpaid wages, whichever is smaller....

87.    Cobb's demand for penalties is frivolous.   Cobb cannot claim in good faith that he was an "employee" of MK because he was an independent contractor and professional, and because of his refusal to become an MK employee.

88.    Cobb's demand for penalties is also frivolous because MK has, and Cobb cannot deny that MK has, "reasonable grounds for dispute" as to its obligations to Cobb, if any.

14

### III. COUNT ONE
### DECLARATORY JUDGMENT

89.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

90.    MK has advised Cobb that he is not entitled to any further compensation for his work with MK by reason of his breach of contract with MK to submit draft bills timely and in substantial compliance with insurers' guidelines.

91.    Cobb nonetheless has claimed that he is entitled to compensation for his time which MK maintains he is not entitled to compensation as set forth above.

92.    Essentially, by means of Cobb's extreme delay in submission of bills, the demands of equity and conscience are such that the contract with MK be deemed to have been changed so that he is not entitled to payment unless and until the insurers pay for time that MK can submit under their billing guidelines and practices.

93.    There exists a real, substantial and present controversy between MK and Cobb as to the respective rights and obligations under the contract.

94.    MK is "interested" in the contract between itself and Cobb, and its rights, status or other legal relations are affected by that contract.

95.    MK is entitled to a declaration of the validity of its rights, status or other legal relations under its contract with Cobb.

96.    More specifically, MK is entitled to a declaration that it has:  a) complied with all of its obligations to Cobb under their contract; b) that MK does not owe any further compensation to Cobb; c) that Cobb is in material breach of the contract; d) that Cobb was not an "employee" of MK for purposes of the application Delaware wage and hour law; e) that MK has "reasonable grounds

15

for dispute" as to its liability to Cobb and refusal to pay him as per his demand for payment; and f) is

obligated to pay compensatory damages to MK.

## IV. COUNT TWO
## BREACH OF CONTRACT

97.    MK repeats and realleges all previous allegations of the Complaint as set forth herein

at length.

98.    Cobb's obligation to submit draft bills to MK in substantial conformity with insurers'

guidelines and practices was a material term of the contract between them.

99.    MK repeatedly advised Cobb that he was not complying with the insurers' guidelines

and practices as to the timeliness, form and content of his submission of draft bills.

100.    Despite such advice, and Cobb's assurances that he would comply, Cobb either failed

to submit bills, or, for those he did submit, they were late and/or not in the proper form and content

in accordance with the insurers' guidelines and practices.

101.    MK has been unable to submit bills to the insurers for hundreds of hours of work

from its Delaware office for cases that Cobb was supervising.

102.    MK has been damaged by reason of Cobb's material breach of contract.

## V. COUNT THREE
## BREACH OF FIDUCIARY DUTY

103.    MK repeats and realleges all previous allegations of the Complaint as set forth herein

at length.

104.    MK and Cobb operated MK's Wilmington, Delaware practice as a joint venture, for

the mutual aim of serving MK's clients and for Cobb to profit thereby.

105.    By reason of their joint venture, MK and Cobb stood in a relationship of trust and

confidence to each other.

16

106.    MK reposed its trust and confidence in Cobb to not only manage litigation for its clients, the insurers' insureds, but also to provide draft bills in a timely manner and in substantial compliance with the insurers' guidelines and practices.

107.    If MK could not collect its fees from the insurers because Cobb failed to prepare proper draft bills in a timely fashion, then both Cobb and MK would lose the opportunity for compensation from the insurers for that work.

108.    Cobb, therefore, owed a fiduciary duty to MK to provide it with draft bills in a timely fashion and in substantial compliance with insurers' guidelines and practices.

109.    Cobb himself would benefit from bills submitted timely to MK and in proper format, because MK would essentially advance him $125 per hour for all such time presented to it.

110.    Cobb breached his fiduciary duty to MK in that he failed to provide it with draft bills in a timely fashion and in a form that was substantially compliant with insurers' guidelines and practices.

111.    MK has been damaged by reason of Cobb's breaches of fiduciary duty.

## VI. COUNT FOUR
## BREACH OF COVENANT OF
## GOOD FAITH AND FAIR DEALING

112.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

113.    The contract between MK and Cobb contains an implied covenant that neither party would do anything that would deprive the other of the benefits of the contract.

114.    Cobb's untimely submission of draft bills to MK that were substantially non-compliant with MK's billing guidelines and practices of the insurers, deprived MK of the benefit of their contract and/or their joint venture.

115.    MK has been damaged by reason of Cobb's breach of the covenant and good faith and fair dealing in the contract and/or joint venture agreement between them.

## VII. COUNT FIVE
## PROMISSORY ESTOPPEL

116.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

117.    Cobb made clear and definite promises to MK that he would submit draft bills to it in a sufficiently timely fashion, and which complied substantially in form and content with MK's billing guidelines and the insurers' practices, so that MK could then submit them to insurers and receive payment accordingly.

118.    MK actually and reasonably relied on Cobb's clear and definite promises in permitting him to become the supervisor of its Delaware practice and entrusting him with billing responsibilities for his work on the files he supervised for MK there.

119.    In response to MK's requests for compliance with the billing guidelines, Cobb repeatedly assured MK that he would comply, but he failed to do so.

120.    Cobb has breached his clear and definite promises to MK that he would submit draft bills in a timely fashion and which were in substantial compliance with the billing guidelines and the insurers' practices.

121.    MK has been damaged by reason of its reasonable reliance on Cobb and his breach of his clear and definite promises to MK.

## VIII. COUNT SIX
## EQUITABLE ESTOPPEL

122.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

18

123.    Cobb refused to become an employee of MK, instead entering into a contract and/or joint venture agreement with it concerning the supervision and operation of MK's Delaware practice.

124.    Cobb assured MK that he would comply with his contract with MK to prepare draft bills for submission to the insurers in a timely manner and in substantial compliance with their guidelines and practices.

125.    Despite those efforts, Cobb repeatedly remained out of compliance and failed to provide draft bills for submission to the insurers as per his undertaking.

126.    Cobb was repeatedly advised by MK partners and administrative personnel: a) of what he needed to do to submit draft bills in a timely fashion and in substantial compliance with the insurers' guidelines and practices; b) that Cobb could not be compensated for his time that was submitted late to MK where it could not collect fees from the insurers due to his inadequate draft bill submissions; c) MK would lose its 'profit margin' for his hours for which it could not submit bills to the insurers; and d) that Cobb would get paid 'when we [MK] got paid'.

127.    Cobb acknowledged that the foregoing advice was correct.

128.    Despite those acknowledgments, Cobb continually failed to submit draft bills in a timely fashion or in a manner that was substantially consistent with the insurers' guidelines and practices.

129.    MK has been damaged by reason of Cobbs' failure to complete his undertaking.

130.    The demands of equity and conscience are such that Cobb cannot deny that: a) he was not an employee of MK; b) his failure to submit draft bills in accordance with the requirements that he himself has acknowledged has damaged MK; c) he is not entitled to any further compensation from MK for time spent working on its files for which he failed to submit proper draft bills; d) that

he is liable to MK for its 'profit margin' for the time he spent working on its files for which it was unable to submit bills to the insurers due to Cobb's own omissions; and e) that he is not entitled to get paid until MK may be paid by the insurers for invoices he submitted.

## VIX. COUNT SEVEN
## EQUITABLE FRAUD

131.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

132.    As set forth above, Cobb repeatedly assured MK that he would comply with its billing guidelines and his contract and submit draft bills in a timely fashion in order to receive payment and so that MK could submit them to the insurers and receive payment accordingly.

133.    As set forth above, Cobb acknowledged that, in response to being encouraged by MK administrative personnel and partners to submit his draft bills, he would get paid when MK got paid by the insurers.

134.    Cobb omitted to disclose a material fact to MK following such assurances, namely that he simply was unable or unwilling to submit draft bills in a timely fashion.

135.    Cobb stood in a relationship of trust and confidence to MK, and owed it a duty of loyalty and honesty in fact in his communications with it concerning billing.

136.    MK reasonably relied on Cobb's assurances that he would comply with its requests that he submit timely draft bills in continuing its affiliation with him.

137.    Cobb has breached MK's trust and confidence by submitting the overwhelming majority of his draft bills late and/or in a format that was not appropriate for submission to the insurers without substantial editing.

138.    MK is entitled to rescission of its contract with Cobb or, in the alternative, to

reformation of the contract so that he is not entitled to be paid unless and until MK is paid by the insurers, and following subtraction of MK's "profit" on any time of Cobb's that could not be submitted to the insurers because his draft bills were untimely and/or not in proper form.

## X. COUNT EIGHT
## NEGLIGENT MISREPRESENTATION

139.    MK repeats and realleges all previous allegations of the Complaint as set forth herein at length.

140.    As set forth above, Cobb repeatedly assured MK that he would comply with its billing guidelines and his contract and submit draft bills in a timely fashion in order to receive payment and so that MK could submit them to the insurers and receive payment accordingly.

141.    Cobb stood in a relationship of trust and confidence to MK, and owed it a duty of reasonable care in making representations to it concerning his compliance with MK billing guidelines, and with affecting such compliance.

142.    MK reasonably relied on Cobb's assurances that he would comply with its requests that he submit timely draft bills in continuing its affiliation with him.

143.    Cobb failed to exercise reasonable care in making giving assurances to MK about his submission of draft bills, because he later was unable or unwilling to submit draft bills in a timely fashion.

144.    MK was damaged by reason of Cobb's failure to exercise reasonable care.

**WHEREFORE,** Plaintiff, McGivney & Kluger, P.C., demands judgment against defendant, Raymond W. Cobb, Esq., and Raymond W. Cobb, LLC, jointly and severally, for:

A.    Declaratory relief under Count One above pursuant to 10 Del. C. § 6501, *et seq.*, N.J.S.A. 2A:16-50, *et seq.*; and/or 28 U.S.C. § 2201, *et seq.*

B.       Compensatory damages on all Counts;

C.       Such equitable relief, including rescission and/or reformation, on Counts Six and

Seven, as well as on all other Counts as the Court may deem just and appropriate;

D.       Such other and further relief as the Court may deem just and appropriate; and

E.       Such attorneys' fees and costs of suit as may be permitted by law.

## XI.  DEMAND FOR JURY TRIAL

Plaintiff, McGivney & Kluger, P.C., demands a trial by jury on all issues so triable herein.

**McGIVNEY & KLUGER, P.C.**

  */s/ Mary F. Higgins*
Mary F. Higgins (DE Id. No. 4179)
1001 N. Jefferson Street
Suite 208
Wilmington, DE 19801
Telephone:  (302) 225-0458
Facsimile:   (302) 777-4111

Dated:  March 7, 2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**McGIVNEY & KLUGER, P.C.**
Mary F. Higgins (No. 4179)
1001 North Jefferson Street, Suite 208
Wilmington, DE 19801
(302) 225-0458 – Telephone
(302) 777-4111– Facsimile
Attorneys for Defendant

| | |
|---|---|
| RAYMOND W. COBB and RAYMOND W. COBB, LLC, A Delaware Limited Liability Company,<br><br>      Plaintiffs,<br><br>         vs.<br><br>McGIVNEY & KLUGER, P.C., A Foreign Professional Corporation<br><br>      Defendant. | **CERTIFICATE OF SERVICE**<br><br>**Civil Action No. 08-cv-00123 (TBA)** |

     I declare under penalty of perjury that on this 7th day of March, 2008, I caused a true and exact copy of the above **Answer, Counterclaim, Demand for Jury Trial and Separate Defenses** to be served upon counsel for plaintiffs, Jeffrey M. Weiner, Esquire, Law Offices of Jeffrey M. Weiner, P.A., 1332 King Street, Wilmington, Delaware 19801, through the Court's electronic filing system.

                                 */s/ Mary F. Higgins*
                               Mary F. Higgins (DE Id. No. 4179)

## <u>DECLARATION PURSUANT TO FRCP 7.1(a)</u>

     I hereby declare under penalty of perjury that defendant McGivney and Kluger, P.C. is: a) a nongovernmental party; b) that it has no parent corporation; and c) that no publicly traded corporation owns 10% or more of its corporate stock or other ownership.

     I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing statements made by me are true and I am aware that if they are willfully false, I am subject to punishment.

                               */s/ Mary F. Higgins*
                                 Mary F. Higgins (DE Id. No. 4179)

Dated:  March 7, 2008